**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

**MAY 6 2002**

**PATRICK FISHER**
**Clerk**

EVA B. HUNTSINGER,

   Plaintiff - Appellant,

  v.

BOARD OF DIRECTORS OF
THE E-470 PUBLIC HIGHWAY
AUTHORITY,

   Defendant - Appellee.

No. 01-1218

(D. Colorado)

(D.C. No. 99-S-260)

ORDER AND JUDGMENT *

Before **HENRY** , **ANDERSON** , and **MURPHY** , Circuit Judges.

Eva B. Huntsinger brought this action under 42 U.S.C. § 1983 against the

Board of Directors of the E-470 Public Highway Authority ("Authority"), alleging

that she was terminated from her employment in violation of her First Amendment

right to speak on a matter of public concern, and that the Authority interfered

with her opportunities for future employment in violation of her Fourteenth

---

*This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Amendment substantive due process rights. She also alleged state law causes of action for breach of express contract and breach of implied contract. The district court dismissed Ms. Huntsinger's federal claims pursuant to Fed. R. Civ. P. 12(b)(6), reasoning that Ms. Huntsinger's complaint did not state claims upon which relief could be granted. The court then declined to retain supplemental jurisdiction over Ms. Huntsinger's state law claims and dismissed them without prejudice.

On appeal, Ms. Huntsinger reasserts the arguments she presented to the district court, and also contends that the district court applied the wrong standard for dismissal under Fed. R. Civ. P. 12(b)(6). In addition, she argues that the district court abused its discretion by dismissing her state claims. As indicated by the discussion below, we largely agree with the reasoning of the district court and affirm.

## BACKGROUND

### A. Facts

As required by our review of a dismissal pursuant to Fed. R. Civ. P. 12(b)(6), the following facts are taken directly from the allegations contained in Ms. Huntsinger's complaint. Ms. Huntsinger is a professionally licensed civil engineer who worked at the Authority as a Special Projects Engineer from

February 5, 1996, until her termination on October 8, 1998. The Authority is a "body corporate and political subdivision of the state of Colorado established in 1987," and is "responsible for the financing, construction and operation of a toll highway designated as E-470, located on the eastern perimeter of the Denver metropolitan area ('Project')." Compl. at ¶ 5. Prior to her termination from the Authority, Ms. Huntsinger's responsibilities included "work preparatory to the submission of proposals by consultants . . . , review of [the] same proposals, response to inquiries regarding development of the [P]roject, and selection of future consultants for Segment IV of the [Project]." Appellant's Opening Br. ("Appellant's Br.") at 3 (citing Compl. at ¶ 13). Ms. Huntsinger earned approximately $90,000 per year, including benefits, and received "nothing but stellar employment evaluations" prior to her termination. Compl. at ¶ 8.

In the summer and fall of 1998, the Authority received a number of proposals from bid teams seeking to secure the construction contract for Segment IV. One such proposal included a consultant by the name of CH2M Hill ("Hill"). Ms. Huntsinger's husband worked for Hill for nearly twenty-five years, serving as its Executive Vice President at the time of his resignation in February 1998. In connection with his resignation, Mr. Huntsinger received a $296,000 promissory note ("Note") from Hill, a large portion of which remained unsatisfied but was not yet due at the time the Authority received Hill's proposal.

Ms. Huntsinger asserts that when she became aware of the Hill proposal on September 1, 1998, "she became concerned that the Note from Hill to Mr. Huntsinger potentially created a conflicting interest between the Authority and Hill." Id. at ¶ 14. In response, Ms. Huntsinger took it upon herself to "see whether action could be taken with regard to the Note to remove the potential conflict." Id. at ¶ 15. In this regard, Ms. Huntsinger embarked on a series of communications with various persons associated with both Hill and the Authority:

1. On September 1, 1998, Ms. Huntsinger had two phone conversations with Mr. Dirk Stauthamer, "Vice President of Human Resources at Hill, and the person responsible for preparing a separation agreement between Mr. Huntsinger and Hill." Id. According to Ms. Huntsinger, the purpose of these conversations was to "see whether action could be taken with regard to the Note to remove the potential conflict." Id.

2. After Ms. Huntsinger spoke with Mr. Stauthamer, she attempted to contact Mr. Stephen D. Hogan, the Authority's Executive Director. When he could not be reached, she called Mr. T. Edward Icenogle, the Authority's outside counsel. [1] Ms. Huntsinger asserts that she "informed [Mr. Icenogle] of her call to Mr. Stauthamer" and that he told her "that calling Mr. Stauthamer was the correct approach." Id. at ¶ 16.

3. On September 8, 1998, Ms. Huntsinger finally spoke with Mr. Hogan, in person, and informed him "of the potential conflicting interest." Id. at ¶ 17. During this meeting, she "presented Mr. Hogan with a draft letter she had written, for Mr. Hogan's signature, to the chief financial officer of Hill, pursuant to which Mr. Hogan would ask Hill to retire the Note to avoid any potential conflict of

_____

[1]Ms. Huntsinger asserts that this call occurred "approximately fifteen minutes after her first conversation with Mr. Stauthamer." Compl. at ¶ 16.

interest." Id. at ¶ 17. Ms. Huntsinger contends that she "modeled this draft letter after a similar letter that Mr. Hogan had signed on behalf of another Authority employee under similar circumstances," and that "Mr. Hogan told [her] that he had no problem with her approach, but that he first wanted to fax the draft to Mr. Icenogle for his review." Id. According to Ms. Huntsinger, "[t]he draft was faxed to Mr. Icenogle," but "Mr. Hogan never signed or sent [it] to Hill." Id.

4. Later on September 8, after her meeting with Mr. Hogan, Ms. Huntsinger received a facsimile letter from Mr. Wyatt McCallie, Hill's general counsel. According to Ms. Huntsinger, Mr. McCallie's letter "erroneously stated that Ms. Huntsinger told Mr. Stauthamer that 'the conflict could result in [Hill] being removed from the selection process.'" Id. at ¶ 19. The letter further suggested that Mr. Huntsinger go ahead and "submit a written request for prepayment of the Note to Hill's Board of Directors prior to the next board meeting." Id. at ¶ 19. In response to this facsimile letter, Ms. Huntsinger "left two voice mail messages for Mr. McCallie describing the errors in his . . . correspondence" and provided him with a letter of her own, dated September 9, 1998, "describing . . . that her 'sole intent . . . [was] to avoid any perceived conflict of interest relative to [Hill] and her ' and to look 'for suggestions by which we and [Hill] can resolve the issue at hand.'" Id. at ¶ 20 (emphasis added).

5. After receiving Mr. McCallie's facsimile on September 8, Ms. Huntsinger immediately sent a letter to Mr. Hogan "to reiterate the potential conflict . . . [and] that she would continue to recuse herself from the selection process for any work related to Hill." Id. at ¶ 21.

6. Finally, Ms. Huntsinger spoke to Mr. Icenogle on October 6, 1998, to inquire whether "he had any discussions regarding the Note." Id. at ¶ 24. According to Ms. Huntsinger, Mr. Icenogle responded that "he had had 'informal' communications with Mr. McCallie," and that she would "get her marching orders from Matt

McDole."[2]  Id. at ¶ 24.  Ms. Huntsinger contends that she immediately contacted Mr. McDole, who said "he knew nothing about it."  Id.

On October 8, 1998, two days after the last of these communications, Ms. Huntsinger received a notice of termination in her office mailbox.  In an October 14, 1998, letter from Mr. Icenogle, "the Authority purported to fully explicate the basis for [Ms. Huntsinger's] termination," stating that she had "violated four sections of the Authority's personnel policies."[3]  Id. at ¶ 25.  One such policy stated as follows:

> Conflict of Interest  :  No Employee shall engage in any activity or enterprise which conflicts with the duties as an Authority Employee or with the duties, functions, and responsibilities of the Division in which employed (sic) . . . .  Any potential or perceived conflict of interest must be reported, in advance, to the Executive Director        .

Id. at ¶ 12 (citing Authority Personnel Policies, § 5.12) (second emphasis added).

On October 23, 1998, the Authority sent a letter to all consultants submitting proposals on Segment IV explaining the situation regarding Ms. Huntsinger's contacts with Hill.  This letter states as follows:

_____

[2]Mr. McDole was the Authority's chief engineer, and was apparently Ms. Huntsinger's immediate supervisor.  Compl. at ¶ 23.

[3]A pre-termination hearing was held in front of Mr. McDole, who affirmed Ms. Huntsinger's termination in a one paragraph decision on November 23, 1998. Compl. at ¶ 27.  Subsequently, a post-termination hearing was held in front of the Authority's acting Executive Director, who affirmed Mr. McDole's decision on January 8, 1998.  Id.

-6-

This letter is to advise you of a situation which has occurred in connection with the Authority's Segment IV procurement. There has been an unauthorized contact by an Authority employee with one member of a team responding to the Authority's Segment IV Request for Qualification by stating its qualifications to propose on the finance/design/build of Segment IV of E-470.

An employee of the Authority, who may have been considered for a minor role in reviewing segment IV proposals, contacted one of the Segment IV respondents and requested that, in order to resolve a perceived conflict of interest, one of the members of the responding team pay a debt owed, but not yet due, to the employee's spouse.

The Authority has conducted a thorough investigation of this matter. The Authority assures you that this employee has not been involved in any review of Segment IV statements of qualification and will not be involved in any future review of Segment IV proposals or in the administration of the contract, if awarded. The Authority wishes to further state all of its staff and consultants will be instructed that no prosper is to be favored or disfavored by the Authority as a result of that employee's unauthorized contact or any consequences of that contact.

Id. at ¶ 28 (quoting the Authority's October 23, 1998, letter).

2.    **Procedure**

Ms. Huntsinger filed suit against the Authority on or about February 8, 1999, claiming that the Authority had "no legal or factual basis for [its] position" that she violated four sections of the Authority's personnel policies,            id. at ¶ 25, and that she was terminated as a result of her efforts to "resolve the potential conflict(s) of interest" with Hill.      Id. at ¶ 31. In her first claim for relief against the Authority, Ms. Huntsinger asserts that her "actions in attempting to resolve

the potential conflict(s) of interest were protected by the First Amendment to the United States Constitution," id., and that the Authority terminated her "in retaliation" for her exercise of her First Amendment rights, in violation of 42 U.S.C. § 1983. Id. at ¶ 33. Ms. Huntsinger's claim in this regard is based entirely on the six instances of communication described above.

Ms. Huntsinger's second claim for relief, entitled "Substantive Due Process," alleges that the Authority "took action to terminate [her] based on the October 23 1998 [letter]," id. at ¶ 31, that the letter "seriously damaged [her] standing and associations in the community and foreclosed her freedom to take advantage of future employment opportunities," id. at ¶ 38, and that she was thereby "deprived . . . of her liberty interest in her employment in violation of the Fourteenth Amendment to the United States Constitution," also in contravention of 42 U.S.C. § 1983. Id. at ¶ 39. Ms. Huntsinger further asserted two state law claims alleging that the Authority breached either an express or an implied contract of employment. Id. at ¶¶ 41-54.

In April 1999, the Authority filed its motion to dismiss Ms. Huntsinger's federal causes of action. Regarding Ms. Huntsinger's First Amendment claim, the Authority argued that "Ms. Huntsinger cannot meet the threshold requirement of showing that her alleged speech involved a matter of public concern." Def's Mot. for Partial Dismissal at 5, App. at 42. Regarding her Substantive Due Process

-8-

claim, the Authority asserted that she had no claim for deprivation of a liberty interest under the Fourteenth Amendment because, as a matter of law, she "can prove no set of facts establishing that [the October letter] falsely stigmatized her, impugning her good name, reputation, honor, or integrity, or curtailing her future employment opportunities." Id. at 9, App. at 46.

The Authority's motion was referred to a magistrate judge pursuant to 28 U.S.C. § 636(b). After considering the briefs and hearing argument from the parties, the magistrate judge issued a detailed and comprehensive report recommending the dismissal of Ms. Huntsinger's federal claims. Ms. Huntsinger filed the appropriate objections to the magistrate judge's recommendations, advancing additional arguments as to why her First Amendment claims should not be dismissed, and relying on her original opposition brief with respect to her Substantive Due Process claim. Upon de novo review of the parties' filings, including Ms. Huntsinger's objections, the district court adopted the recommendations of the magistrate judge and dismissed Ms. Huntsinger's federal claims.

With regard to Ms. Huntsinger's First Amendment claim the district court concluded that "Ms. Huntsinger's communications . . . about a potential conflict of interest was [sic] not sufficiently helpful in evaluating the conduct of [the] government so as to constitute speech on a matter of public concern," and was

"instead speech primarily addressed to a matter of personal interest." Order at 9, App. at 149. Regarding Ms. Huntsinger's Substantive Due Process claim, the district court adopted the magistrate judge's conclusion that the "plaintiff has not shown that the statements made in the October 23, 1998 letter are false or that, if false, they directly attack plaintiff's character and reputation." Recommendation of Magistrate Judge at 11, App. at 105;    see also Order at 4, App. at 144.

**DISCUSSION**

**I.**

"We review de novo the district court's dismissal for failure to state a claim upon which relief can be granted."    Dill v. City of Edmond  , 155 F.3d 1193, 1201 (10th Cir. 1998) (citing    Pelt v. Utah  , 104 F.3d 1534, 1540 (10th Cir. 1996)). In so doing, we consider the complaint as a whole, accepting all well-pleaded factual allegations as true, and construing those allegations, and all reasonable inferences therefrom, in the light most favorable to Ms. Huntsinger as the non-moving party. Id.; Dry v. United States  , 235 F.3d 1249, 1252 (10th Cir. 2000);    David v. City & County of Denver  , 101 F.3d 1344, 1352 (10th Cir. 1996). Dismissal is "inappropriate unless [Ms. Huntsinger] can prove no set of facts in support of [her] claims that would entitle [her] to relief."    Dill, 155 F.3d at 1201. In conducting our analysis, however, we need not accept as true any conclusory

-10-

allegations contained in the complaint, Southern Disposal, Inc. v. Texas Waste Mgmt., 161 F.3d 1259, 1262 (10th Cir. 1998), and a party may not overcome pleading deficiencies by advancing arguments on appeal that extend beyond the actual allegations contained in the complaint. Bauchman v. West High School, 132 F.3d 542, 550 (10th Cir. 1997). Applying these standards of review, we address each of Ms. Huntsinger's Section 1983 claims in turn.

## A. First Amendment

In order to state a cognizable claim for wrongful termination in violation of the employee's First Amendment right to speak on a matter of public concern, the complaint must contain allegations of fact that, if proved, would establish certain required elements. First, the complaint must allege facts sufficient to demonstrate that Ms. Huntsinger's alleged speech was actually protected, as a matter of law, by the First Amendment. The threshold question in this protection analysis is whether Ms. Huntsinger's alleged speech can be "'fairly characterized as constituting speech on a matter of public concern.'" Koch v. City of Hutchinson, 847 F.2d 1436, 1440 (10th Cir. 1988) (quoting Rankin v. McPherson, 483 U.S. 378, 384 (1987) (further quotations omitted)). Second, the complaint must allege facts sufficient to prove that Ms. Huntsinger's protected speech "was a 'substantial factor' or a 'motivating factor' in the [Authority's] adverse

employment decision." Ballard v. Moskogee Reg. Med. Ctr., 238 F.3d 1250, 1252 (10th Cir. 2001) (quoting Mount Healthy City Sch. Dist. Bd. of Ed. v. Doyle, 429 U.S. 274, 287 (1977)).

"Matters of public concern are those of interest to the community, whether for social, political or other reasons." Dill, 155 F.3d at 1201. For instance, "[w]hile speech pertaining to internal personnel disputes and working conditions ordinarily will not involve public concern . . . , 'speech that seeks to expose improper operations of the government or questions the integrity of governmental officials clearly concerns vital public interests.'" Finn v. New Mexico, 249 F.3d 1241, 1247 (10th Cir. 2001) (quoting Conaway v. Smith, 853 F.2d 789, 797 (10th Cir. 1988) (emphasis added) (further citations omitted)). The essential question, therefore, is "'whether the public or the community is likely to be truly concerned with or interested in the particular expression, or whether it is more properly viewed as essentially a private matter between employer and employee.'" Edwards v. City of Goldsboro, 178 F.3d 231, 247 (4th Cir. 1999) (quoting Berger v. Battaglia, 779 F.2d 992, 999 (4th Cir.1985) (internal quotation marks omitted)). In performing this inquiry, we must consider "the content, form and context of a given statement." Connick v. Myers, 461 U.S. 138, 147-48 (1983).

The district court concluded for two reasons that Ms. Huntsinger's complaint did not state a cognizable claim that her alleged speech qualified as

speech on a matter of public concern that was protected by the First Amendment. First, the district court concluded that, taken as a whole, the complaint demonstrates that Ms. Huntsinger's speech was motivated by primarily personal interests. Second, the district court concluded, in substance, that the complaint contained no allegations of corruption or ineptitude on the part of the Authority that would warrant protection of the speech in question. Upon de novo review, we agree with the district court and add the following reasoning: [4]

Beginning with Ms. Huntsinger's first call to Hill on September 1, it is clear that her stated purpose was personal. The complaint shows that instead of following the requirements of the Authority's personnel policies and simply informing Authority executives about her perceived conflict of interest with Hill, so that they could investigate and handle it according to Authority protocol, she took it upon herself to call Hill. In that call, she suggested that a conflict might exist with respect to how Hill's bid might be treated by the Authority (without sufficiently alleging how her position within the Authority or her job duties would

_____

[4]In so doing, we reject Ms. Huntsinger's contention that the district court "misapplied the standard of review," failing to give her the benefit of all reasonable inferences. Appellant's Br. at 10-11. The district court specifically stated that Ms. Huntsinger's speech failed to qualify for First Amendment protection, "even assuming all the well-pleaded allegations of Ms. Huntsinger's complaint are true, and giving her the benefit of all reasonable inferences that may be drawn from such allegations." Order at 10, App. at 150. Regardless of whether Ms. Huntsinger agrees or disagrees with the district court's ultimate conclusions, the court clearly applied the appropriate standards.

actually create such a conflict), and proposed, at that time, only one way to resolve the "conflict," i.e, early retirement of the Note. The complaint does not allege that Ms. Huntsinger, at any time during this initial conversation with Hill, ever proposed another method of resolving the perceived conflict, such as disclosure and/or her own removal from the bid process. Furthermore, Ms. Huntsinger's call to Hill was not to the person at Hill actually responsible for the bid on Segment IV, but was instead to the Vice President of Human Resources, the same person who drafted her husband's separation agreement, which included the Note.

Even after she finally informed her supervisors at the Authority of the situation, she did not seek their guidance on whether a conflict actually existed, explore alternative solutions or request instructions on how to proceed in the event there was an actual conflict, or even consider whether the matter should be left to higher level Authority executives to investigate and resolve the conflict as they saw fit. Rather, she informed them of what she had already done, and urged them to resolve what she saw as a conflict only through early retirement of the Note. She also continued to have personal, direct and unauthorized contact with Hill representatives. As indicated above, the factual recitations in the complaint, taken as a whole, demonstrate that Ms. Huntsinger was not focused on resolving a potential conflict for the benefit of the public good and the good of the Agency,

but was intent on resolving her conflict solely in a way which served her personal interests.

In response, Ms. Huntsinger contends that the issue is one of motive, and that questions regarding her motive cannot be resolved on a motion to dismiss. She argues that "[e]stablishing motive nearly always requires extensive factual and credibility determinations not appropriate for disposition absent the presentation of evidence." Appellant's Br. at 11. But, that is not the decisive issue in this case. The question of whether or not speech touches upon a matter of public concern is a question of law, Dill, 155 F.3d at 1202, and the motive aspects of this inquiry can be resolved without evidence, on a motion to dismiss, where, as here, plaintiff can prove no facts to establish that her motive for speaking was other than personal. See Witt v. Roadway Exp., 136 F.3d 1424, 1431 (10th Cir. 1998) (dismissal under Rule 12(b)(6) appropriate where "it appears that the plaintiff can prove no set of facts in support of the claims that would entitle the plaintiff to relief") (internal quotations omitted).

Ms. Huntsinger also contends that her speech was not motivated solely by personal interest, but that she spoke with a "'broader public purpose.'" Appellant's Br. at 17 (quoting Gardetto v. Mason, 100 F.3d 803, 812 (10th Cir. 1996)). Relying on Jandro v. Foster, 53 F. Supp. 2d 1088 (D. Colo. 1999) and Finn, 249 F.3d 1241, Ms. Huntsinger argues that her speech was motivated at

least partially by a desire to "speak on an issue of public concern, equivalent to the legitimate concerns of other members of the public, regarding the operations of the government." Appellant's Br. at 16. We are not persuaded. As already discussed, we conclude that Ms. Huntsinger's complaint, taken as a whole, demonstrates that her speech related solely to her personal interests. Her case is not at all like Jandro and Finn, where it was determined that the plaintiffs had a mixed motive, speaking on personal matters as well as matters which qualified under the law as matters of public interest deserving of First Amendment protection. [5]

It is significant that Ms. Huntsinger's complaint is entirely devoid of any allegations of corruption or malfeasance on the part of the Authority that would entitle her speech to protection under the First Amendment. [6] Although the

---

[5]See Finn, 249 F. 3d at 1248 (noting that although "many portions of plaintiff's speech dealt with matters of purely personal interest," they also "sought to expose the allegedly illegal nature of the Department's reorganization, the lack of integrity and qualifications of the Department's management, ineptitude of the Department's management, loss of Department funds due to management's poor decision-making, and the impact of [a manager's] alleged affair with a subordinate on his decision to promote that subordinate"); Jandro, 83 F. Supp. 2d at 1096 ("The allegations of plaintiff's complaint create an inference that plaintiff was motivated, at least in part, by a desire to vindicate his wife's personal interests; however, an inference can be drawn that plaintiff was also motivated by a concern similar to that shared by other citizens. . . .").

[6]In response to questions at oral argument, counsel for Ms. Huntsinger suggested for the first time that Ms. Huntsinger's speech was intended to uncover general corruption within the Authority, insinuating, perhaps, that the Authority

(continued...)

purpose of her third communication was to inform Mr. Hogan of the perceived

conflict and to propose action for its resolution, the purpose of the fifth

communication was to inform Mr. Hogan that she would refrain from working on

Segment IV proposals until after the perceived conflict was resolved, and the

purpose of her sixth communication was to follow up with the Authority's outside

counsel regarding whether there had been any further communications with Hill

or any further action taken on the Note.  She never once alleged in any of her

communications that the Authority ever urged her to drop the issue, refused to

address the matter, attempted to cover-up or avoid the perceived conflict, acted to

improperly benefit from her perceived conflict with Hill, had a history of corrupt

practices relating to this kind of alleged conflict, or otherwise acted with

malfeasance or ineptitude in violation of the public trust or Authority policies.

Cf. Gardetto v. Mason , 100 F.3d at 812-15 (holding that speech motivated

primarily by the speaker's personal interest "in maintaining her staff," or

involving matters related to "internal budgetary decision[s]" did not qualify for

first amendment protection, but that speech involving the "electoral process," the

---

6(...continued)
engaged in a general practice of mishandling conflicts of interest.  However, her
complaint contains no allegations to support such a theory.  See, e.g., Dean Witter
Reynolds, Inc. v. Howsam, 261 F.3d 956, 960 (10th Cir. 2001) ("[I]t is generally
unacceptable for a court to [look beyond the four corners of the complaint] when
deciding a Rule 12(b)(6) motion to dismiss").

"integrity, qualifications, and misrepresentations of a highly visible public official," the general "expenditures of public funds," or the "overall management of the public institution" was protected); Witham v. Baptist Health Care of Okla., 98 F.3d 581, 583 (10th Cir. 1996) (holding that speech that "offered nothing at all to inform the public about the management of the [public] hospital" and that did not expose "government ineptitude, waste or corruption" did not qualify for First Amendment protection).

Indeed, the factual allegations contained in Ms. Huntsinger's complaint show that the Authority did not have a pattern of mishandling or ignoring potential conflicts. Ms. Huntsinger alleges that the letter she drafted for Mr. Hogan's signature on September 8 was modeled after a letter he sent in a similar situation, suggesting that he had taken affirmative action in the past to address potential conflicts where they actually arose and where such action was deemed an appropriate remedy. Likewise, she alleges that the Authority sent the October 23 letter to all Segment IV bid teams explaining the employee's unauthorized contact with a bidder and assuring the bid participants that the situation would not inappropriately influence the decision-making process, demonstrating that the Authority was ready, willing and able to address conflicts if and when they arose.

Having read the complaint as a whole, it is apparent that Ms. Huntsinger's complaint is not with the Authority's handling of conflicts in general, but with the

-18-

way the Authority handled her personal situation, because they did not resolve it in the particular manner she desired. We infer from the allegations in the complaint that it was not until this lawsuit, which naturally occurred only after she had been terminated, that Ms. Huntsinger ever spoke out publicly about any supposed problems within the Authority, or ever criticized or questioned the way in which the Authority was handling potential conflicts. [7]

In defense of the omissions in her complaint, Ms. Huntsinger asserts on appeal that although there was no actual corruption or misapplication of funds in this particular case, she was acting "early in the process to avoid the perception that a breach of public trust had been committed." Appellant's Br. at 22. She essentially argues that the law should be extended to protect not only speech relating to active government misconduct, but also to speech made as a supposed preemptive strike against possible misconduct. She cites no controlling authority for this proposition, however, and we reject it as presented here.

---

[7]On appeal, Ms. Huntsinger notes that "one need not speak publically in order to receive First Amendment protection," suggesting that we may not consider the private nature of her speech to preclude First Amendment protection. Appellant's Br. at 15. We disagree. Although private speech may, in an appropriate circumstance, qualify as protected speech, see Conaway, 853 F.2d at 797, we may nonetheless consider the private versus public nature of the alleged speech as a non-dispositive factor in concluding that the plaintiff was not speaking on a matter of public concern and that her speech is therefore not entitled to protection under the First Amendment.

In sum, Ms. Huntsinger's complaint does not allege speech on a matter of public concern because her alleged speech did not "sufficiently inform the issue as to be helpful to the public in evaluating the conduct of government," Wilson v. City of Littleton, 732 F.2d 765, 768 (10th Cir. 1984), and provided nothing to the "free and unhindered debate on matters of public importance," Pickering v. Board of Ed., 391 U.S. 563, 573 (1968). Accordingly, on de novo review of the complaint we conclude, as did the district court, that Ms. Huntsinger's allegations do not make out a First Amendment claim upon which relief can be granted.

**B. Substantive Due Process**

In order to state a cognizable claim that the Authority violated Ms. Huntsinger's liberty interest, the complaint must contain allegations of fact that, if proved, would establish that "'[the Authority] took action to terminate [Ms. Huntsinger] based upon a public statement of unfounded charges of dishonesty or immorality that might seriously damage [Ms. Huntsinger's] standing or associations in the community and foreclose [her] freedom to take advantage of future employment opportunities.'" Garcia v. City of Albuquerque, 232 F.3d 760, 771 (10th Cir. 2000) (quoting Palmer v. City of Monticello, 31 F.3d 1499, 1503 (10th Cir. 1994) (internal quotations omitted)) (emphasis added). Specifically, the complaint must contain allegations sufficient to prove that "'(i) the defendant

made a statement impugning [the employee's] good name, reputation, honor or integrity[,] (2) the statement was false[,] (3) the defendant made the statement in the course of the termination proceedings or the statement foreclosed future employment opportunities[,] and (4) the statement was published.'" Id. at 772 (quoting Tonkovich v. Kansas Bd. of Regents, 159 F.3d 504, 526 (10th Cir. 1998)).

In dismissing Ms. Huntsinger's Substantive Due Process claim, the district court adopted the conclusions of the magistrate judge, finding that Ms. Huntsinger's complaint did not allege sufficient facts as to the first two required elements, i.e., that the statements made in the October 23 letter "are false or that, if false, they directly attack plaintiff's character and reputation." Recommendation of Magistrate Judge at 11, App. at 105; Order at 4, App. at 144. With regard to the truth or falsity of the October 23 letter, the court concluded as follows:

> [T]he court finds that plaintiff has not demonstrated that the statements in the letter are false. The letter simply recites the facts that the Authority did not authorize the contact plaintiff had with Hill, that an employee requested that the team member pay the debt owed to the employee's spouse and that the employee had not been involved in the review of Segment IV statements of qualification. *See* Comp. ¶ 28. Plaintiff does not allege that these events did not occur. Indeed, plaintiff further avers in her complaint that she drafted a letter for the use of the Authority's executive director to Hill's chief financial officer, in which plaintiff requested that the note be retired to avoid any potential conflict of interest.

Recommendations of Magistrate Judge at 10, App. at 104. With regard to whether the October 23 letter tainted Ms. Huntsinger's good name and/or reputation, the court made the following findings:

> Plaintiff also fails to set forth facts alleging that the letter impugned her good name, reputation or integrity. The letter does not identify plaintiff and does not accuse her of anything other than an unauthorized contact. Plaintiff affirmatively pleads that she contacted Hill and others with respect to the promissory note. Plaintiff has not alleged facts to demonstrate that the letter has harmed her reputation in the community.

Id. at 10-11, App. at 104-05. Upon de novo review of the complaint we agree with these conclusions of the district court. We further point out that (i) Ms. Huntsinger avers in her complaint that she indeed contacted Hill prior to receiving authorization from her supervisors at the Authority, (ii) nothing in the complaint or the letter itself alleges that Ms. Huntsinger engaged in any act of dishonesty or immorality, (iii) Ms. Huntsinger's complaint does not allege that Ms. Huntsinger actually sought and was denied employment with any of the companies to whom the letter was sent. Accordingly, we conclude, as did the district court, that the allegations in Ms. Huntsinger's complaint, taken as a whole, do not make out a Substantive Due Process claim upon which relief can be granted.

## II.

As indicated above, after the district court dismissed Ms. Huntsinger's federal claims, it declined to retain supplemental jurisdiction over her state law claims, dismissing them without prejudice. Such a dismissal is within the discretion of the district court under 28 U.S.C. § 1367(c)(3). See also Bauchman v. West High Sch., 132 F.3d 542, 549 (10th Cir. 1997) (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988)); Key Fin. Planning Corp. v. ITT Life Ins. Corp., 828 F.2d 635, 644 (10th Cir. 1987).

On appeal, Ms. Huntsinger asserts that the district court abused its discretion because "discovery had essentially been completed on the breach of contract . . . claims." Appellant's Br. at 27. She argues that "the court essentially forces the parties to duplicate substantial effort in the state court," and that this is a "very inefficient and wasteful method of resolving disputes." Id. at 27-28.

Although "the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness" may be relevant in deciding whether or not to exercise supplemental jurisdiction, Thatcher Enter. v. Cache County. Corp., 902 F.2d 1472, 1478 (10th Cir. 1990), nothing prevents the parties in this case from agreeing to utilize any discovery already obtained in any future state court proceeding. See Harrison v. Landmark Comm. Pub. of Tenn., Inc., 892 F. Supp. 199, 201 (E.D. Tenn. 1995). Furthermore, this is not a case where the parties had

completed all necessary pre-trial proceedings, or actually tried their case to a jury. See Tonkovich v. Kansas Bd. of Regents, 254 F.3d 941, 945 (10th Cir. 2001) (finding no abuse of discretion "given the relative lack of pretrial proceedings"). Cf. Jones v. Intermt. Pwr. Proj., 794 F.2d 546, 549 (10th Cir. 1986), overruled on other grounds by Yellow Freight Sys., Inc. v. Donnelly, 494 U.S. 820, 822 (1990)) (holding that once trial has been held, "this court will order dismissal of a pendent claim . . . only when the federal cause of action was so insubstantial and devoid of merit that there was no federal jurisdiction to hear it"). On these facts, we cannot conclude that the district court abused its discretion by dismissing the state law claims without prejudice.

## CONCLUSION

For the reasons set forth above, the judgment of dismissal is AFFIRMED.

ENTERED FOR THE COURT

Stephen H. Anderson
Circuit Judge

-24-